Opinion issued March 9, 2006            



















In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-05-00179-CV
 
ANGLO-DUTCH PETROLEUM INTERNATIONAL, INC. AND ANGLO-DUTCH (TENGE) LLC, Appellants
 
V.
 
JOHN HASKELL, CHRIS SCULLY, CHRIS O’SULLIVAN, CHARLES
MCCORD III, THE SHERIFF FAMILY LLC, AND LAW FUNDS, LLC
F/K/A AMICUS LEGAL FUNDING, LLC, Appellees
 

 
 
On Appeal from the 157th District Court
Harris County, Texas
Trial Court Cause No. 2004-21054-A
 

 
 
O P I N I O N
          Appellants, Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch
(Tenge) LLC (collectively, “Anglo-Dutch”), challenge the trial court’s rendition of
summary judgment


 in favor of appellees, John Haskell, Chris Scully, Chris
O’Sullivan, Charles McCord III, the Sheriff Family LLC, and Law Funds, LLC f/k/a
Amicus Legal Funding, LLC, in appellees’ breach of contract suit arising out of
multiple litigation funding agreements executed by Anglo Dutch and appellees. In
its first and second issues, Anglo-Dutch contends that the trial court erred in granting
summary judgment in favor of appellees because the evidence raises a genuine issue
of material fact as to whether appellees charged Anglo-Dutch a usurious rate of
interest in the agreements and whether the agreements were illegal, unregistered
securities. In its third issue, Anglo-Dutch contends that the trial court erred in
granting summary judgment in favor of appellees because the agreements violated
Texas public policy. In its fourth issue, Anglo-Dutch contends that the trial court
erred in awarding appellees their attorneys’ fees and costs because appellees were not
entitled to summary judgment. We affirm. 
Factual and Procedural Background
          In 2000, Anglo-Dutch filed suit against “Halliburton” and “Ramco” (the
“Halliburton lawsuit”) alleging that Halliburton and Ramco misappropriated Anglo-Dutch’s trade secrets and breached their confidentiality agreements with Anglo-Dutch, which were executed by the parties during the course of developing an oil and
gas field.


 Anglo-Dutch sought damages in the amount of $650 million allegedly “for
the profits it would have earned” if Halliburton and Ramco had not breached their
confidentiality agreements and misappropriated Anglo-Dutch’s trade secrets. Anglo-Dutch retained attorneys John O’Quinn, John L. McConn Jr., and Jett Williams III to
represent it in the Halliburton lawsuit. 
          Due to the expense associated with prosecuting the Halliburton lawsuit, and in
order “to operate its business, to retain its employees, and to avoid bankruptcy until
it could recover a judgment from Halliburton and Ramco,” Anglo-Dutch needed to
raise money. Anglo-Dutch initially, but unsuccessfully, sought to borrow money
from commercial banks, using the Halliburton lawsuit as collateral. As appellees
allege in their petition, Anglo-Dutch then contacted multiple parties, including
appellees, and solicited investments in the Halliburton lawsuit. Based upon Anglo-Dutch’s express written and oral representations concerning the possible returns on
their investments, appellees agreed to invest monies, at least in part, to fund the
Halliburton lawsuit. Pursuant to the terms of multiple Claims Investment
Agreements, appellees invested a total of approximately $560,000. These agreements
defined the terms of the parties’ relationships and set forth the formulas for
calculating any returns appellees would be entitled to receive in the event that Anglo-Dutch obtained a cash recovery in the Halliburton lawsuit. Appellees assert that, by
executing these agreements, they obtained a preferential right of recovery in Anglo-Dutch’s settlement proceeds in the Halliburton lawsuit. 
          After the Halliburton lawsuit was tried to a jury, the trial court entered a
judgment in the amount of approximately $81 million, including approximately $10
million in attorneys’ fees, against Halliburton and Ramco. Anglo-Dutch and
Halliburton subsequently entered into a settlement agreement, the terms of which are
undisclosed.


 Following Anglo-Dutch’s and Halliburton’s settlement, Anglo-Dutch
sent each appellee a letter in which it disputed the validity of the litigation funding
agreements and asserted that the agreements were “contrary to Texas public policy”
and “unenforceable under Texas law.” Consequently, Anglo-Dutch requested that
appellees accept a reduced payment contrary to the terms of the agreements. 
          Appellees refused Anglo-Dutch’s offer of reduced payments and filed the
instant suit against Anglo-Dutch, asserting claims for breach of contract, fraud,
breach of fiduciary duty, conspiracy, and conversion.


 Appellees then filed a
summary judgment motion on their breach of contract claim, in which they asserted
that they were entitled to judgment as a matter of law because, per the terms of the
litigation funding agreements, following receipt of the settlement proceeds from
Halliburton, Anglo-Dutch’s “disbursement of such funds to [appellees] . . . per their
secured, preferential right to first recovery of their investments was to be made by
[Anglo-Dutch] as a ministerial act.” In support of their motion, appellees attached
their own affidavit testimony and documentary evidence, including a solicitation
letter sent from Anglo-Dutch to appellee John Sheriff. Appellees testified that, after
filing the Halliburton lawsuit, Anglo-Dutch began soliciting investments in the
Halliburton lawsuit and that the proposed investments were structured as preferential
partial assignments of Anglo-Dutch’s recovery in the Halliburton lawsuit. Appellees
further testified that Anglo-Dutch induced appellees to invest in the Halliburton
lawsuit by providing them with written and/or oral representations and warranties
concerning the nature of the allegations in the lawsuit, the experience of the
plaintiff’s counsel and their accomplishments in prior litigation, and the return of the
investment offered to investors. In its letter to Sheriff, Anglo-Dutch outlined its need
to raise “plaintiff funding” and recognized that such funding “is expensive financing,
but affordable if the anticipated recovery is large enough.” Anglo-Dutch detailed the
history of its dispute with Halliburton, stated that it was suing for $680 million plus
punitive damages, noted that Texas law “is favorable” to the types of claims it was
asserting, and described the qualifications of its trial counsel. Anglo-Dutch also
attached to its letter to Sheriff a copy of a Claims Investment Agreement. Appellees
asserted that Anglo-Dutch made similar solicitations to all appellees. 
          Appellees also attached to their summary judgment motion copies of the
Claims Investment Agreements and the Assignments of Cash Recovery executed by
each appellee and by Anglo-Dutch. While the agreements differed in some respects,
including the amount of the investment and the amount of any return, all of the
agreements were similarly structured. The agreements generally referred to each
appellee as an “Investor” and characterized each investor as being a first, second,
third, or fourth tier investor, depending on certain variables, such as the date of
investment. The appellees’ “investor’s rights” were determined by their assigned tier
and a payment schedule included in the agreements. 
           The agreements uniformly provided that Anglo-Dutch was “selling interests
in any Cash Recovery . . . that it may receive from the [Halliburton] lawsuit.” The
agreements also stated:
Payments by Anglo-Dutch to Investor. If and only if, a final disposition
or settlement of the Lawsuit results in a Cash Recovery to Anglo-Dutch,
Anglo-Dutch shall pay (or cause to be paid) to Investor the sum total of:
 
          (a)     its Investment, plus,
 
          (b)     an amount equal to its Investment, plus
 
          (c)     a return on its Investment (hereinafter referred to as the
“Investor’s Return”)


 . . . .
 
. . . .
 
If a final disposition or settlement of the Lawsuit fails to result (for
whatever reason) in a Cash Recovery, then Anglo-Dutch shall have no
obligation to make any payment to Investor for any portion of the
Investor’s Total Return. If the Cash Recovery received by Anglo-Dutch
is insufficient to pay all of the Investor’s Total Return, Anglo-Dutch
shall pay (or cause to be paid) to Investor from the Cash Recovery, only
the portion of Investor’s Total Return as is possible by applying all of
Anglo-Dutch’s portion of the Cash Recovery in accordance with the
Order of Payments Schedule . . . after which Anglo-Dutch shall have no
further liability or obligation to Investor for any portion of its Investor’s
Total Return remaining unpaid.
 
. . . .
 
Order of Payments Schedule. . . . It is further understood that Investor
shall have no claim or right to any portion of the Cash Recovery due or
payable to any attorneys retained at any time by Anglo-Dutch. 
 
           . . . . 
Time of Payment. If and when a final disposition or settlement of the
Lawsuit results in a Cash Recovery, Anglo-Dutch shall pay (or cause to
be paid) to Investor all (or the proportionate share, as the case may be)
of its Investor’s Total Return in accordance with the Order of Payments
Schedule within ten (10) days following Anglo-Dutch’s receipt of such
Cash Recovery. If such Cash Recovery is received by Anglo-Dutch in
installments over time, then Anglo-Dutch (if necessary, because the
amounts of such installments are insufficient to pay all the Investor’s
Total Returns) shall pay Investor its respective Investor’s Total Returns
in installments (over the same period of time) in accordance with the
Order of Payments Schedule, until such time as the Investor’s Total
Returns (or its proportionate share thereof) shall have been paid in full.
 
          The agreements further provided that in the event of Anglo-Dutch’s
bankruptcy, the investor’s interest in any cash recovery would not be described as a
debt or obligation of Anglo-Dutch. An Assignment of Cash Recovery was attached
to each agreement, providing each investor with a security interest in any cash
recovery received by Anglo-Dutch. The assignments stated that “Anglo-Dutch
hereby assigns, transfers, and sets over to Investor its proportionate share of Anglo-Dutch’s right, title and interest in and to any Cash Recovery . . . actually received by
Anglo-Dutch from the [Halliburton] Lawsuit . . . as continuing and collateral security
for the payment of obligation due and owing by Anglo-Dutch to Investor.”
          Also attached to appellees’ summary judgment motion were letters from Anglo-Dutch to appellees, which were sent after entry of the judgment against Halliburton
and Ramco and after Anglo-Dutch concluded its settlement with Halliburton,
requesting that appellees accept a lower payment than was provided for in the
agreements. In these letters, Anglo-Dutch claimed that appellees’ refusal to accept
its proposed lower payment “put at risk Anglo-Dutch’s ability to resolve the Lawsuit
with Halliburton” and asserted that the agreements were contrary to Texas public
policy and unenforceable. With these letters, Anglo-Dutch enclosed checks for the
amount of the reduced payments and stated that, by depositing the checks, appellees
would be releasing Anglo-Dutch from any future liability. The appellees refused to
accept the reduced payments.
          In its response to appellees’ summary judgment motion, Anglo-Dutch
contended that (1) the litigation funding agreements were usurious loans, (2) if the
agreements were not loans, they were illegal, unregistered securities, and (3) the
agreements violated Texas public policy. In support of its argument that appellees’
investments were actually usurious loans, Anglo-Dutch asserted that appellees
“understood that Anglo-Dutch was virtually certain to recover in the lawsuit at least
an amount sufficient to repay the principal advanced by [appellees],” that appellees
were “in the business of evaluating and financing lawsuits,” and that, at a minimum,
“there [was] a genuine issue of material fact regarding whether Anglo-Dutch’s
obligation to repay was absolute.” Anglo-Dutch attached to its response the affidavit
of Scott Van Dyke, president of Anglo-Dutch, who testified that, during the
prosecution of the Halliburton lawsuit, Anglo-Dutch needed to raise money to operate
its business and avoid bankruptcy, that Anglo-Dutch made unsuccessful attempts to
borrow money from commercial banks and other lenders, and that he learned that
certain parties were willing to “loan funds to plaintiffs in lawsuits with repayment to
be made out of such plaintiff’s recovery.” Van Dyke stated that he had conversations
with each of the appellees regarding “the proposed transaction where they would loan
Anglo-Dutch money and be repaid from Anglo-Dutch’s recovery in the Halliburton
lawsuit.” In entering into these “proposed loan transactions” with appellees, Van
Dyke presented the appellees with the Claims Investment Agreements, which Van
Dyke stated were form documents that had been provided to him by another lender
who had previously furnished Anglo-Dutch funds during the pendency of the
Halliburton lawsuit. 
          Van Dyke also testified in support of Anglo-Dutch’s specific contentions that,
at the time the agreements were executed, “[appellees] expected their loans to be
repaid,” that the parties “considered Anglo-Dutch’s recovery to be quite certain,” and
that the contingency of repayment expressed in the agreements was “in reality non-existent.” Specifically, Van Dyke testified that “[d]uring discovery, counsel for
Anglo-Dutch found numerous documents and obtained testimony which conclusively
established that the confidentiality agreements had been breached” and that “damages
were effectively established by Halliburton’s and Ramco’s own documents.” Van
Dyke also testified that, during his conversations with appellees, he described to
appellees the details of the Halliburton lawsuit and showed them the relevant
evidence. He explained to appellees “that there was no risk to their principal”
because (1) the evidence “showed that Halliburton and Ramco had breached their
confidentiality agreements,” (2) Halliburton’s own “economic model showed that the
interest . . . lost as a result of the breach by Halliburton and Ramco was valued . . . at
hundreds of millions of dollars,” and (3) Anglo-Dutch’s lawyers “had an excellent
track record of settling or winning cases.” Van Dyke further testified that he assured
appellees that “the facts relating to the Halliburton lawsuit were such that [he] and
[his] able trial counsel were confident that recovery of an amount sufficient to repay
them and others who had or would loan funds to Anglo-Dutch was not speculative”
and that he “understood at the time and [he] expressed to each of the [appellees] that
Anglo-Dutch had an absolute obligation to repay them.” Finally, Van Dyke testified
that Anglo-Dutch recorded these agreements as loans and as borrowed funds.


 
Anglo-Dutch also attached to its response the affidavit of David Leathers, a financial
expert, who testified that he reviewed the Claims Investment Agreements and
Assignments of Cash Recovery, as well as other documentary evidence, that it was
his “understanding that Anglo-Dutch was obligated to pay (or cause to be paid) to
each Investor an amount defined as the ‘Investor’s Total Return,’” and that he
determined that the annual interest rate on the “Investor’s Total Returns” ranged from
62% to 186%.
          The trial court granted appellees’ summary judgment motion and ordered that
appellees recover from Anglo-Dutch $2,556,105.51 in actual damages plus
$52,001.80 in attorneys’ fees. The trial court then severed appellees’ breach of
contract claim from their remaining claims, creating a final and appealable judgment.
Standard of Review
          The movant for summary judgment has the burden of showing that there is no
genuine issue of material fact and that it is entitled to summary judgment as a matter
of law. Tex. R. Civ. P. 166a(c); Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548
(Tex. 1985). A plaintiff moving for summary judgment on its claim must establish
its right to summary judgment by conclusively proving all the elements of its cause
of action as a matter of law. Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217, 223 (Tex.
1999). If a defendant wishes to assert an affirmative defense to the summary
judgment motion, it must urge the defense in its response and provide enough
summary judgment evidence to create a fact issue on each element of the defense. 
Beathard Joint Venture v. W. Houston Airport Corp., 72 S.W.3d 426, 434 (Tex.
App.—Texarkana 2002, no pet.); Jones v. Tex. Pac. Indem. Co., 853 S.W.2d 791, 795
(Tex. App.—Dallas 1993, no writ). A nonmovant asserting an affirmative defense
is not required to prove the affirmative defense as a matter of law—raising a fact
issue is enough. Brownlee v. Brownlee, 665 S.W.2d 111, 112 (Tex. 1984). In
conducting our review, we assume that all evidence favorable to the nonmovant is
true and indulge every reasonable inference and resolve all doubts in favor of the
nonmovant. Nixon, 690 S.W.2d at 548–49. 
Usury
          In its first issue, Anglo-Dutch argues that the trial court erred in granting
summary judgment in favor of appellees because the evidence raises a genuine issue
of material fact as to whether appellees charged Anglo-Dutch a usurious rate of
interest in the agreements. Anglo-Dutch urges this Court to “look beyond the
language” of the agreements to determine the parties’ intent. Anglo-Dutch asserts
that the summary judgment evidence shows that “the alleged contingency was not a
real contingency and, therefore, the parties intended their agreements to be loans,
which Anglo-Dutch had an absolute obligation to repay.” Anglo-Dutch further
asserts that, in considering its usury allegations, parol evidence is admissible to
establish that the parties intended their transactions to be loans and that such extrinsic
evidence, contradicting the terms of an agreement, may be considered in determining
if an agreement is usurious. Anglo-Dutch notes that, despite the terms of the
agreements, Van Dyke testified that he and appellees understood the agreements to
be loans, that Anglo-Dutch believed it had an absolute obligation to repay the
principal on the loans, and that appellees understood that their agreements “were not
speculative” and involved “no risk.” Alternatively, Anglo-Dutch argues that even if
there was a “real contingency” in the agreements, the agreements were still usurious
because, once Anglo-Dutch settled with Halliburton, it had an absolute obligation to
repay appellees.
          Appellees contend that, based on the “specific and unambiguous terms” of the
agreements, repayment of their investments was based on an absolute contingency,
the transactions were not loans, and usury laws do not apply. Appellees note that the
agreements do not describe the investments as loans, do not use the word interest, do
not state an interest rate, and do not provide a specific repayment date for a sum
certain. Appellees further note that the Halliburton lawsuit was a “highly complex,
multi-party commercial lawsuit that took over three years of extensive discovery and
contested motion practice before it even reached a nine week trial,” that some
appellees invested only four months into the suit, and that all appellees invested
during the lengthy discovery process, when the outcome of the lawsuit was
unpredictable and uncertain. Appellees assert that, despite Anglo-Dutch’s usury
allegations, parol evidence is not admissible to directly contradict the terms of the
agreement, and further assert that, even if Van Dyke’s affidavit and Anglo-Dutch’s
other evidence are considered, there is still no question of fact to defeat the summary
judgment on Anglo-Dutch’s usury defense.
          The essential elements of a usurious transaction are “(1) a loan of money, (2)
an absolute obligation to repay the principal, and (3) the exaction of a greater
compensation than allowed by law for the use of the money by the borrower.” First
Bank v. Tony’s Tortilla Factory, Inc., 877 S.W.2d 285, 287 (Tex. 1994); Holley v.
Watts, 629 S.W.2d 694, 696 (Tex. 1982); Oyster Creek Fin. Corp. v. Richwood Invs.
II, Inc., 176 S.W.3d 307, 322–23 (Tex. App.—Houston [1st Dist.] 2004, pet. denied);
see also Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994). “A factor that courts
consider when determining usury is whether repayment was based on a contingency.” 
Catalina, 881 S.W.2d at 297. This factor is important because it helps a court in
determining whether a transaction was a loan or a business investment. Id.; see also
Bray v. McNeely, 682 S.W.2d 615, 619 (Tex. App.—Houston [1st Dist.] 1984, no
writ); Beavers v. Taylor, 434 S.W.2d 230, 231–32 (Tex. Civ. App.—Waco 1968, writ
ref’d n.r.e.). If a transaction is missing any of the above identified three elements, it
cannot be usurious. See Holley, 629 S.W.2d at 696–97. Thus, if the agreements did
not constitute a loan, if the agreements did not create an absolute obligation to repay,
or if the agreements did not charge “usurious interest,” Anglo-Dutch’s usury defense
fails as a matter of law.
          “‘Loan’ means an advance of money that is made to or on behalf of an obligor,
the principal amount of which the obligor has an obligation to pay the creditor.” 
Tex. Fin. Code Ann. § 301.002(a)(10) (Vernon Supp. 2005) (emphasis added). 
“‘Interest’ means compensation for the use, forbearance, or detention of money.” Id.
§ 301.002(a)(4). “‘Usurious interest’ means interest that exceeds the applicable
maximum amount allowed by law.” Id. § 301.002(a)(17). If there is no “loan,” then
any disputed amount charged cannot be characterized as interest, and without interest,
there cannot be usury. See First USA Mgmt., Inc. v. Esmond, 960 S.W.2d 625, 628
(Tex. 1997). “Usury statutes are penal in nature and should be strictly construed.” 
Tony’s Tortilla Factory, Inc., 877 S.W.2d at 287; Oyster Creek Fin. Corp., 176
S.W.3d at 323. “When construing a contract under a usury claim, courts presume the
parties intended a nonusurious contract.” Fin. Sec. Servs., Inc. v. Phase I Elecs. of
W. Tex., Inc., 998 S.W.2d 674, 677 (Tex. App.—Amarillo 1999, pet. denied).          Under the plain terms of the agreements, appellees’ right to recover their
principal and any return on their investment was contingent upon Anglo-Dutch’s cash
recovery, if any, in the Halliburton lawsuit. Per the unambiguous terms of the
agreements, Anglo-Dutch did not have an absolute obligation to repay the principal
amounts that appellees invested. In its arguments, Anglo-Dutch confuses the terms
“contingency” and “risk.” Appellees’ belief that they were exposed to little or no risk
does not negate the contingency in the agreements. Here, it is indisputable that, if
Anglo-Dutch recovered nothing or an insufficient amount of damages, then according
to the plain terms of the agreements, Anglo-Dutch had no obligation to reimburse
appellees for the principal amounts invested, much less pay appellees any return on
their investments. Thus, as a matter of law, the agreements cannot be usurious. 
Rinyu v. Teal, 593 S.W.2d 759, 761 (Tex. Civ. App.—Houston [14th Dist.] 1979, writ
ref’d n.r.e.) (finding sale of property with lease back provision and option to
repurchase did not constitute usurious loan since grantee could not force grantor to
exercise option, and there was no absolute obligation to repay); Pansy Oil Co. v. Fed.
Oil Co., 91 S.W.2d 453, 457 (Tex. Civ. App.—Texarkana 1936, writ ref’d) (stating
that “repayment of any amount under said contract . . . rested on the contingency,
first, that the well to be drilled would produce oil; and, second, that it would produce
enough oil to fulfill the contract” and finding that plaintiff’s usury claims failed);
Korth v. Tumlinson, 73 S.W.2d 1048, 1049 (Tex. Civ. App.—San Antonio 1934, no
writ) (finding agreement to advance funds in exchange for promise to pay one-third
of net proceeds upon sale of parcel of land not usurious because terms of contract did
not show that principal would be absolutely repayable and instead showed that if land
was not sold, lender would receive nothing); cf. Johns v. Jaeb, 518 S.W.2d 857, 859
(Tex. Civ. App.—Dallas 1974, no writ) (finding, as matter of law, that transaction
was loan rather than contribution to limited partnership because there was absolute
obligation to pay funds originally advanced to limited partnership and lender did not
expose his “investment to the hazards of the business”). 
          As Anglo-Dutch emphasizes, however, we must examine the form of the
transaction and its substance in determining the existence or non-existence of usury.
Gonzales County Sav. & Loan Ass’n v. Freeman, 534 S.W.2d 903, 906 (Tex. 1976). 
Thus, we recognize that whether an amount of money being charged constitutes
interest depends not on what the parties call it, but on the substance of the transaction. 
First USA Mgmt., Inc., 960 S.W.2d at 627. For example, in Tony’s Tortilla Factory,
Inc., the supreme court stated that a court “may look past the label of the fee to
determine if a fee is a service charge or interest” and that, if there is a question of fact
when there is a dispute in the evidence concerning the purpose of the fee, a jury may
determine if the fee is “merely a device to conceal usury.” 877 S.W.2d at 287. 
Additionally, other courts of appeals have stated that while “the document containing
the allegedly usurious demand is the primary source from which to divine the
drafter’s intent,” a party may offer extrinsic evidence to prove that a contract is
usurious. Strasburger Enters., Inc. v. TDGT Ltd. P’ship, 110 S.W.3d 566, 574 (Tex.
App.—Austin 2003, no pet.); Hoxie Implement Co. v. Baker, 65 S.W.3d 140, 146
(Tex. App.—Amarillo 2001, pet. denied); see also Bray, 682 S.W.2d at 617 (stating
that “to determine whether this transaction should be classified as a loan or a sale, we
must look to the intention of the parties as revealed by the contract and the
surrounding circumstances”)
          However, the “extrinsic evidence” offered by Anglo-Dutch is not sufficient to
create a fact issue concerning Anglo-Dutch’s absolute obligation to repay appellees. 
Anglo-Dutch’s “extrinsic evidence” consists almost entirely of the affidavit of Van
Dyke, in which he testifies that both he and Anglo-Dutch considered the agreements
to be loans. But, even as Anglo-Dutch recognizes, any particular “label placed upon
the transaction by the parties should not control the determination of whether that
transaction is a loan.” Najarro v. SASI Int’l Ltd., 904 F.2d 1002, 1007 (5th Cir. 1990)
(refusing to consider affidavit testimony that transaction was investment when terms
of written contract between parties unambiguously constituted loan). Since we are
permitted to look beyond labels contained in a parties’ agreement, we are also
permitted to look beyond labels contained in a party’s affidavit. Anglo-Dutch’s
subjective intent concerning the nature of these agreements does not trump the
language contained in the agreements themselves concerning the lack of an absolute
obligation of Anglo-Dutch to repay appellees in the event that it did not obtain a cash
recovery in the Halliburton lawsuit. See Johns, 518 S.W.2d at 860 (finding
agreement to advance funds constituted usurious loan and noting that defendant’s
intent not to charge usury was immaterial “since the intent of the parties is presumed
to be reflected in the documents which they signed”). 
          Here, the agreements clearly set forth a contingency upon which appellees
would be reimbursed, and Anglo-Dutch did not have an absolute obligation to repay
appellees the monies they invested. Rather, Anglo-Dutch’s obligation depended upon
a contingency beyond appellees’ control. The labels that Van Dyke attempted to
assign to the terms of the agreements after the conclusion of the Halliburton lawsuit
do not appear in the agreements themselves, but instead only appear in his affidavit
testimony. We may not simply accept Van Dyke’s labels concerning an absolute
obligation to repay. Rather, we must instead focus on the substance of the
transaction.  
          Van Dyke’s testimony that he explained to appellees that there was “no risk”
and that he was confident that Anglo-Dutch would “collect enough money” to repay
appellees because Anglo-Dutch’s interest in the oil and gas field lost as a result of
Halliburton’s and Ramco’s actions was valued in the “hundreds of millions of
dollars,” is also insufficient to create a fact issue concerning Anglo-Dutch’s usury
defense. These statements merely constituted Van Dyke’s personal expectations on
the success of the Halliburton lawsuit, and the fact that he communicated his personal
expectations to appellees is of no consequence; Van Dyke’s “confidence in the
outcome of the lawsuit” did not dissolve the very real contingency that existed in the
agreements themselves. Similarly, Van Dyke’s testimony that appellees
communicated to him that they did not consider their investments to be speculative,
that some appellees stated that they believed that success in the Halliburton lawsuit
was certain, that one appellee told Van Dyke that he could not afford to lose his
money, and that multiple appellees stated that there must be “no risk whatsoever”
because of Anglo-Dutch’s trial counsel also constitute nothing more than appellees’
personal expectations on the success of the Halliburton lawsuit. As such, it does not
erase the contingency in the agreements. Significantly, despite Van Dyke’s testimony
concerning his and appellees’ confidence in the outcome of the lawsuit, the very real
contingency contained in the agreements is illustrated by the fact that the amount of
the judgment that Anglo-Dutch ultimately received in the Halliburton lawsuit was
significantly lower than what it had anticipated and, importantly, what it had
represented to appellees that it would receive at the end of the case. 
          Here, there is no competent evidence showing that, by the time appellees
invested, Anglo-Dutch had obtained “incontrovertible evidence” of its claims against
Halliburton and Ramco, and that the evidence established damages in an amount
sufficient to ensure the repayment of appellees’ investment and sufficient to render
the contingency in the agreements illusory. Although we do not have the record of
the Halliburton lawsuit before us, there is nothing in the record of the instant case that
in any way negates the contingency in the agreements. See Korth, 73 S.W.2d at 1050
(stating that contract was not usurious “because it [did] not provide for the absolute
repayment of the sums of money advanced” and it constituted “nothing more than a
joint adventure in which both parties pool[ed] their resources with the hope of making
a profit”).               
          Moreover, we note that the testimony of Van Dyke upon which Anglo-Dutch
relies to create a fact issue consists almost entirely of unsubstantiated legal and
factual conclusions and is not competent summary judgment evidence. See Rizkallah
v. Conner, 952 S.W.2d 580, 587 (Tex. App.—Houston [1st Dist.] 1997, no writ).


 
For example, Van Dyke testified that Anglo-Dutch’s counsel obtained evidence that
“conclusively established that the confidentiality agreements had been breached” and
that Halliburton’s and Ramco’s own documents “effectively established” damages. 
Van Dyke further testified “that there was no risk to [appellees’] principal” because
it was “established” that Halliburton and Ramco breached their confidentiality
agreements and that Halliburton’s economic model “established” that Anglo-Dutch’s
interest in the oil and gas field was valued in the hundreds of millions of dollars. Van
Dyke’s legal conclusions, unsupported by any record evidence, and factual
conclusions, also unsupported by record evidence and largely based on his subjective
beliefs, do not create a fact issue. Also, although the lawyers retained by Anglo-Dutch in the Halliburton lawsuit may have been competent and skilled, this fact is
insufficient to support Van Dyke’s conclusion that recovery was certain. In sum, Van
Dyke’s testimony did not create a fact issue as to whether Anglo-Dutch had an
absolute obligation to repay or that the contingency in the agreements was illusory



and, thus, was insufficient to defeat summary judgment.
          We must also reject Anglo-Dutch’s argument that, even if there originally was
a “real contingency” and a serious risk that Anglo-Dutch might lose the lawsuit, once
it settled with Halliburton, it had an absolute obligation to repay appellees and then
the agreements became usurious. The fact that Anglo-Dutch did receive a cash
recovery in its settlement with Halliburton and the fact that the recovery was
sufficient to enable it to repay appellees their principal and their total returns does not
make the agreements usurious. See Bray, 682 S.W.2d at 619 (finding agreement with
option to purchase did not obligate party to make payment until option was exercised
and, thus, “there was only a contingent obligation at the time the contract was
formed”; further stating that “the fact that Bray did exercise the option does not make
a contract a usurious loan as a matter of law”); Beavers, 434 S.W.2d at 231–32
(holding that fact that contingent payments exceeded lawful interest rate did not
render a contract usurious as matter of law).
          Noting that no other Texas court has addressed usury allegations in the context
of litigation funding agreements, the parties cite a number of cases from other
jurisdictions that have addressed the enforceability of such agreements. Anglo-Dutch
cites Echeverria v. Estate of Lindner, 801 N.Y.S.2d 233 (N.Y. Sup. Ct. 2005),
Lawsuit Financial, L.L.C. v. Curry, 683 N.W.2d 233 (Mich. Ct. App. 2004), and
Rancman v. Interim Settlement Funding Corp., No. 20523, 2001 WL 1339487, at *3
(Ohio Ct. App. Oct. 31, 2001) (not designated for publication). Although we note
that usury laws vary greatly from state to state, as do the policies on which usury laws
are adopted, we consider these cases because this specific issue is one of first
impression in Texas. 
          In Echeverria, the New York Superior Court held that a litigation funding
agreement that provided for a lender’s right of recovery only in the event the plaintiff
received a judgment in his favor charged usurious interest. 801 N.Y.S.2d 233. 
However, the court noted that because the underlying case was a strict liability labor
law case “there was a very low probability that judgment would not be in favor of the
plaintiff” and, in fact, later characterized the probable success of the lawsuit a “sure
thing.” Id. Similarly, in Rancman, the Ohio Court of Appeals concluded that a
litigation funding agreement charged a usurious amount of interest after finding that
evidence presented at trial demonstrated that “no real probability existed that non-payment would occur.”


 2001 WL 1339487, at *3. Unlike the courts’
characterizations of the underlying lawsuits in Echeverria and Rancman, based on the
summary judgment record, we cannot, for the reasons discussed above, characterize
the outcome of the Halliburton lawsuit at the time the appellees signed the investment
agreements as a “sure thing,” and we cannot accept Anglo-Dutch’s position that Van
Dyke’s testimony created a fact issue concerning its usury defense. Rather, unlike the
evidence presented in Rancman, the summary judgment evidence presented in this
case establishes the existence of a contingency and the lack of an absolute obligation
to repay. 
          The final case cited by Anglo-Dutch, from the Michigan Court of Appeals, is
substantively distinguishable. In Curry, the parties entered into a litigation funding
agreement after the jury rendered a verdict in the amount of $27 million. 683 N.W.2d
at 239. While the trial court in Curry still had to resolve a motion for remittitur and
the issue of whether exemplary damages could be awarded, liability had been
established by the time the litigation funding agreement was executed. Id. The court
noted that, contrary to the terms of the non-recourse agreements, at the time the
advances were made, the plaintiff had an “absolute right to repayment” because the
parties entered into the agreements “long after the defendants in the underlying
personal injury lawsuit admitted liability and after the jury returned a verdict of $27
million in damages.” Id. at 240. Thus, the court concluded the agreements were
usurious. Id. Here, there is no evidence that Halliburton had entered a stipulation of
liability, there had not yet been a trial, there had not yet been a finding of liability,
and there had not been a damage award. 
          The reasoning applied by the foreign courts in the cases cited by appellees is
applicable here and is more persuasive. See Dopp v. Yari, 927 F. Supp. 814, 822–24
(D.N.J. 1996); Kraft v. Mason, 668 So. 2d 679, 684 (Fla. Dist. Ct. App. 1996);
Nyquist v. Nyquist, 841 P.2d 515, 518 (Mont. 1992); and Aldrich v. Aldrich, 260 Ill.
App. 333, 1931 WL 1668, at *12–13 (Ill. App. Ct. 1931). For example, in Dopp, the
District Court of New Jersey enforced a litigation funding agreement and rejected a
claim that the agreement was usurious. 927 F. Supp. At 823. The court, noting that
the agreement contemplated a degree of risk to the investor, held that the agreement
was a “joint undertaking of the parties disclosing an intent to distribute proceeds of
the case, if any.” Id. Similarly, in Kraft, the Florida District Court of Appeal
enforced an agreement loaning money to a plaintiff in exchange for a share of any
judgment on the grounds that “when the loan was given, any talk of recovery was
pure speculation.” 668 So. 2d at 684; see also Nyquist, 841 P.2d at 518 (holding
agreement to advance litigation expenses did not constitute loan agreement subject
to usury statute because agreement contained conditional obligation; further stating
“no certainty ever existed that the plaintiffs in the litigation would prevail and receive
a damage award”). Similarly, here, the agreements contained a conditional obligation
and, despite Van Dyke’s testimony concerning his subjective belief, there was no
certainty that Anglo-Dutch would recover an amount sufficient to repay appellees
their principal and returns.
          We overrule Anglo-Dutch’s first issue.
Unregistered Securities 
          In its second issue, Anglo-Dutch contends that the trial court erred in granting
summary judgment in favor of appellees because the evidence raises a genuine issue
of material fact as to whether the agreements were illegal, unregistered securities and
thus, void and unenforceable under both state and federal law. Specifically, Anglo-Dutch argues that the evidence raises fact issues as to whether “(1) the litigation
funding agreements fall within article 33(K) [of the Texas Securities Act],


 and (2)
whether appellees are in pari delicto and therefore barred from enforcing the
agreements.” In support of its in pari delicto defense, Anglo-Dutch asserts that the
evidence shows that “some, if not all, of the appellees shared equal responsibility for
the agreements and occupied a position akin more to that of a promoter than an
investor.” However, the only evidence Anglo-Dutch cites in support of this assertion
is that one of the appellees, Law Funds, “exists entirely for the purpose of financing
lawsuits.” Anglo-Dutch concludes that Law Funds “would have much greater
knowledge of the laws governing the type of agreements that represent its principal
business.” As to the other appellees, Anglo-Dutch asserts that Haskell, Sheriff, and
O’Sullivan are sophisticated investors and Scully and McCord “own oil and gas
businesses.” This evidence, Anglo-Dutch concludes, is “sufficient to at least raise a
fact issue” as to whether the agreements are illegal, unregistered securities.               Appellees argue that, even assuming the agreements can be characterized as
securities under the Securities Act of 1933


 and the Texas Securities Act, the
agreements are not void and unenforceable.


 Appellees stress that the securities laws
exist to protect purchasers, not sellers, and that any failure by Anglo-Dutch to register
the securities provided appellees, not Anglo-Dutch, the right to rescind the
agreements.
          Article 581-33(K) of the Texas Securities Act states:
No person who has made or engaged in the performance of any
contract in violation of any provision of this Act or any rule or order or
requirement hereunder, or who has acquired any purported right under
any such contract with knowledge of the facts by reason of which its
making or performance was in violation, may base any suit on the
contract.
 
Tex. Rev. Civ. Stat. Ann. art. 581-33(K) (Vernon Supp. 2005). 
          Here, Anglo-Dutch has not presented any evidence raising a genuine issue of
material fact that appellees acquired their rights under the agreements “with
knowledge of the facts by reason of which its making or performance was in
violation” of the Act. Furthermore, Anglo-Dutch has not cited any authority for the
proposition that, as the seller of the “unregistered securities,” it has the right to void
the agreements. To the contrary, federal and state authority indicate that the
agreements are not automatically void, but instead are voidable by the purchaser. In
A.C. Frost & Co. v. Coeur D’Alene Mines Corp., 312 U.S. 38, 40–41, 61 S. Ct. 414,
415–16 (1941), the Supreme Court stated “[t]he essential purpose of the [Securities
Act of 1933] is to protect investors by requiring publication of certain information
concerning securities before offered for sale” and that “[n]o provision of the Act
declares that in the absence of registration, contracts in contemplation of or having
relation to a public offering shall be void.”


 The Court noted that “the clear
legislative purpose was protection of innocent purchasers of securities” and that such
purchasers were “given definite remedies inconsistent with the idea that every
contract having relation to sales of unregistered shares is absolutely void.” Id., 312
U.S. at 43, 61 S. Ct. at 417. Similarly, in Smith v. Fishback, 123 S.W.2d 771, 780
(Tex. Civ. App.—Texarkana 1938, writ ref’d), the Texarkana Court of Appeals, in
considering the Texas Securities Act, held that a promoter’s failure to comply with
the securities act did not render the royalty contracts being promoted automatically
void, but instead made them voidable and subject to being set aside by purchasers. 
Accordingly, we hold that Anglo-Dutch has failed to present any evidence sufficient
to raise a fact issue concerning its contention that the agreements are void and
unenforceable under the Texas Securities Act because they were not properly
registered.
          Similarly, Anglo-Dutch has not presented any evidence raising a genuine issue
of material fact concerning its in pari delicto defense. Pursuant to the doctrine of in
pari delicto, “a buyer may not enforce a transaction if (1) the buyer bore at least
substantially equal responsibility for the violations he sought to redress, (2)
preclusion of recovery would not significantly interfere with enforcement of the
securities laws and protection of investors, and (3) the role of the plaintiff in the
transaction was more that of a promoter than investor.” Pinter v. Dahl, 486 U.S. 622,
633–39, 108 S. Ct. 2063, 2071–74 (1988). Here, the evidence showed that Anglo-Dutch actively solicited appellees’ investments. Van Dyke testified that he had
conversations with each appellee regarding the proposed transactions, that he made
a presentation to each of the appellees regarding the transactions, and that he
presented appellees with the Claims Investment Agreements, which were executed
by the parties and which governed the parties’ investment relationships. Anglo-Dutch
did not present any evidence that the role of appellees in the transaction was more
that of a promoter than investor, and thus Anglo-Dutch’s in pari delicto defense fails
as a matter of law.
          We overrule Anglo-Dutch’s second issue. 
Public Policy
          In its third issue, Anglo-Dutch contends that the trial court erred in granting
summary judgment in favor of appellees because the agreements violated Texas
public policy. Anglo-Dutch asserts that the agreements are “champertous


 in
nature,” “prey on financially desperate plaintiffs,” “give third parties control over
litigation in which those parties have no interests at stake,” and “prolong litigation
by inhibiting plaintiffs from settling lawsuits.” Anglo-Dutch further contends that
public policy prohibits an agreement, like the litigation funding agreements here, in
which a third party promises to pay money to a plaintiff “in a pending lawsuit in
exchange for a cash payment or an interest rate that, if the agreement were a loan,
would exceed the maximum allowable interest rate under Texas law.” Anglo-Dutch
notes that appellees did not acquire a percentage interest in its recovery in the
Halliburton lawsuit and instead received a substantial rate of interest on formulas that
were not directly tied to the amount of its recovery. In response, appellees argue that
Texas law authorizes and protects the assignment of interests in pending lawsuits and
that the agreements are valid and enforceable under the laws and public policy of
Texas. 
          In State Farm Fire & Casualty Co. v. Gandy, 925 S.W.2d 696, 707 (Tex.
1996), the Texas Supreme Court stated that “[p]racticalities of the modern world have
made free alienation of choses in action the general rule, but they have not entirely
dispelled the common law’s reservations to alienability, or displaced the role of
equity or policy in shaping the rule.” The court also recognized “the general rule is
that a contractual assignment may be ‘inoperative on grounds of public policy.’” Id.
(citing Restatement (Second) of Contracts § 317(2)(b) (1981)).


 
          Assignments of causes of action that tend to increase and distort litigation may
be found to violate public policy. Gandy, 925 S.W.2d at 707–11 (citing Elbaor v.
Smith, 845 S.W.2d 240, 250 (Tex. 1992) (holding Mary Carter agreements are void
as against public policy); Int’l Proteins Corp. v. Ralston-Purina Co., 744 S.W.2d 932,
934 (Tex. 1988) (holding tortfeasor cannot take assignment of plaintiff’s claim as part
of settlement agreement with plaintiff and prosecute that claim against joint
tortfeasor); Trevino v. Turcotte, 564 S.W.2d 682, 690 (Tex. 1978) (holding
assignment of interests in estate invalid); Zuniga v. Groce, Locke & Hebdon, 878
S.W.2d 313, 316 (Tex. App.—San Antonio 1994, writ ref’d) (holding assignments
of legal malpractice claims invalid)). With these concerns in mind, we address the
specific complaints asserted by Anglo-Dutch. 
          First, we note that Anglo-Dutch has not cited us to any authority that
agreements that are “champertous in nature” are automatically void or against public
policy. See Gandy, 925 S.W.2d at 707. Second, Anglo-Dutch has not presented a
compelling argument of how these agreements prey on financially desperate
plaintiffs. Instead, at least in this case, it was Anglo-Dutch who solicited appellees’
investments after being unable to obtain a conventional loan because it had
inadequate collateral. Here, the amount of returns provided to each appellee and the
formulas upon which the returns were based varied significantly from agreement to
agreement, suggesting that the amount of the returns was bargained for by the parties. 
Moreover, if Anglo-Dutch was financially desperate, as it alleges, it would have been
unable to prosecute the Halliburton lawsuit without the appellees’ funding since, as
Anglo-Dutch concedes, it could not obtain a conventional loan from a commercial
bank. Even Van Dyke testified that the funds advanced by appellees were necessary,
in part, so that Anglo-Dutch could continue to operate its business and avoid
bankruptcy.
          Third, there is no evidence that appellees maintained any control over the
Halliburton lawsuit. The agreements do not contain provisions permitting appellees
to select counsel, direct trial strategy, or participate in settlement discussions, nor do
they permit appellees to look to Anglo-Dutch’s trial counsel directly for payment. 
Thus, the cases cited and the public policy arguments made by Anglo-Dutch are not
pertinent to the agreements at issue in this lawsuit. 
          Fourth, it is not readily apparent that these types of agreements necessarily
increase or prolong litigation. It is doubtful that litigation funding agreements, like
the ones presented here, in which the investor has no right to repayment unless the
plaintiff receives a recovery, serve to increase litigation. Presumably, prior to making
an investment pursuant to a similarly structured agreement, an investor would
consider the merits of the suit and make a calculated risk assessment on the
probability of a return on its investment. An investor would be unlikely to invest
funds in a frivolous lawsuit, when its only chance of recovery is contingent upon the
success of the lawsuit. Finally, in regard to Anglo-Dutch’s argument that the
agreements serve to prolong litigation, it appears here, because of the increasing
returns to which appellees were entitled, the manner in which the agreements were
structured may actually have encouraged settlement. Accordingly, we hold that the
agreements do not violate Texas public policy.
 We overrule Anglo-Dutch’s third issue.
Attorneys’ Fees
          Having overruled Anglo-Dutch’s first three issues, we necessarily overrule its
fourth issue, in which it contends that the trial court erred in awarding appellees
attorneys’ fees because appellees were not entitled to summary judgment. 
Conclusion
          We affirm the judgment of the trial court.
 
 
                                                                        Terry Jennings
                                                                        Justice

Panel consists of Chief Justice Radack and Justices Jennings and Alcala.